## ALASKA FISH SALTING & BY-PRODUCTS CO. v. McMILLAN.

(Circuit Court of Appeals, Ninth Circuit. June 7, 1920.)

No. 3324.

1. **Master and servant ⊕⇒286 (22)—Negligence in failing to provide safe place question for jury.**

   Where a workman was injured by the catching in his clothing of a set screw projecting from a revolving shaft over which he was required to reach to move a lever in performance of his duty, in a place not well lighted, whether it was negligence, and a violation of the master's absolute duty to furnish a reasonably safe place for employés to work, to leave the set screw projecting and unguarded, *held* a question for the jury.

2. **Master and servant ⊕⇒288 (5)—Assumption of risk held question for jury.**

   Whether an employé had knowledge of a projecting set screw on a revolving shaft, by which he was injured, or the light was sufficient to render the danger therefrom obvious, *held* properly submitted to the jury, where the evidence on both questions was conflicting.

3. **Trial ⊕⇒139 (1)—Evidence must be clear to warrant directed verdict.**

   To warrant a directed verdict, the case on the evidence must be clear and indisputable, and about which there could reasonably be but one opinion.

In Error to the District Court of the United States for the District of Alaska; Robert W. Jennings, Judge.

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by David McMillan against the Alaska Fish Salting & By-Products Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error was defendant below, and is prosecuting this writ to reverse a judgment, entered against it and in favor of defendant in error, recovered on account of personal injuries sustained by reason of alleged negligence. For convenience, reference will be made to the parties as plaintiff and defendant.

Defendant is the owner of a factory for producing fertilizer from fish, and plaintiff was an employé, performing his work under a superintendent in charge of the operation of the factory. At the time of the accident, plaintiff was attempting, by means of a lever, to shift a gate used for the purpose of controlling the conveyance of the material in course of manufacture, and while in the act his clothing was caught by a set screw in a revolving shaft, and he was thrown around the shaft and injured. The shaft made about 11 revolutions per minute, and was situated about 3 feet above the platform upon which plaintiff was standing, and required to stand, and the lever was a foot or more above and somewhat beyond the shaft. On one end of the shaft was affixed an octagonal sieve, or, as it is called, a squirrel cage, through which the dry material was conducted, and on the other end was a collar at the bearing, which was attached and held in place by a set screw or set screws, one or two of them, as to which the evidence is not in accord. The distance between the sieve and the collar was about 3 feet. The set screw protruded above the shaft, the latter being 1¹¹/₁₆ inches in diameter. This machinery was located in the second story, or what is called the loft, of the building.

For cause of action it is charged that defendant carelessly and negligently omitted to imbed the set screw or set screws, as the case may be, in the shaft, or in any wise properly to guard or shield them against the contact of workmen when shifting or operating the gate. It is further alleged that the place was poorly lighted, so that workmen were unable readily to observe the condition of the shaft and the presence of the set screws, or to discover the danger present in operating the gate.

The plaintiff was chief engineer about the factory, sometimes designated as chief mechanic, and took care of the machinery of the plant. He did blacksmithing and work of that kind, and directed the installing of the machinery about the mill, and, among other things, the installing of the shaft in question, together with the squirrel cage and chutes, and the gate for controlling the conveyance of the material in course of manufacture; also performed other work in the operation of the mill under the direction of the superintendent, and, among his duties, he was required to shift the gate when occasion demanded. Previously the gate was shifted by means of a wire attachment, which extended to the lower floor, and was operated from there. The wire had become broken, and, without it, it was necessary to ascend to the loft and shift the gate by reaching across the shaft and drawing the lever by hand.

There was a motion for a nonsuit at the close of plaintiff's case, and a motion for an instructed verdict for defendant at the close of the entire evidence, both of which were denied. Error is assigned respecting the action of the court in both respects.

H. L. Faulkner, of Juneau, Alaska, and Frank P. Deering and James Walter Scott, both of San Francisco, Cal., for plaintiff in error.

John R. Winn and Henry Roden, both of Juneau, Alaska, for defendant in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). We pass by the motion for a nonsuit, because in the light of the tes-

timony subsequently adduced in behalf of the defendant the question pertaining to its denial·has been waived.

Counsel for defendant base their contention that the court should have sustained their motion for a directed verdict, as we read their brief, upon two propositions: First, that it was not negligence on the part of the employer to maintain shafting upon which there were unguarded projecting set screws; and, second, that if the unguarded set screws constituted a menace, it was an obvious one, and plaintiff assumed the risk of danger to his person in working about it, or in proximity to it.

[1] The principle of law that it is the duty of the employer to furnish his workmen with a safe place in which to do their work is so well established that it needs no citation of authority to support it. It is just as well established that his duty in this respect is nondelegable; that is to say, he cannot shift the obligation and responsibility to another, and whatever is done by another in that behalf is done as vice principal, and is to be deemed the act of the principal. The duty is therefore absolute.

Now, we may inquire whether the place in which the plaintiff was required to work was in legal contemplation a safe place. It was safe, in view of the issues here made, unless the presence of the set screws in the shaft and the alleged insufficient lighting rendered it unsafe. Under some conditions, that may be readily conceived, the shaft while in motion would have been an exceedingly dangerous instrumentality for one even to approach. Suppose the set screws had protruded several inches, no doubt they would have constituted a dire menace to any one working about the shaft. Miller v. Inman, 40 Or. 161, 66 Pac. 713, is a case of marked analogy, and it was there held that a bolt extending from a pulley from 1½ inches to 1¾ inches beyond the nut rendered the space beneath the shaft an unsafe place in which to require the workman to do his work.

Seeing that these set screws were in the shaft, and that they protruded and were in proximity to the place to be occupied by the workman in operating the lever for opening and closing the gate, and that it was the duty of the workman to reach above and over the shaft to the lever, we are of the opinion that the case presented was one for the jury, and not for the court, to determine whether or not the set screws ought to have been safeguarded in some reasonable way to prevent their contact·with the workman, and whether or not in the end the place was a safe one in which to require the workman to perform his work. This disposes of the first question presented.

[2] The second question pertains to contributory negligence and assumption of risk, and is resolvable really into that of assumption of risk only, in view of the circumstances and conditions attending the putting of the shaft and its appliances in place, and the construction of the machinery about it, including the chutes or conductors, and the gate and its appliances for operating it. It is hardly necessary to state the rule of assumption of risk, but it may be done for the sake of clarity:

"A servant is understood to assume the ordinary risks incident to the particular service in which he voluntarily engages, to the extent those risks are known to him at the time of his employment, or should be readily discernible to a person of his age and capacity in the exercise of ordinary care and prudence. Where the employment is obviously dangerous and hazardous, and conducted in a way fully known to the servant at the outset, he assumes the risk incident to the conduct in that way or manner, although a safer method was known or could have been adopted."

And as to risks arising subsequent to employment the rule is:

"If he [the employé] voluntarily continues, however, without complaint or objection, after knowledge or notice of their existence, under conditions by which he is chargeable with an appreciation of the danger, and where ordinary prudence would require of him a different course, he is held also to take upon himself the responsibility entailed by the risk he continues to incur; and this applies to perils engendered by defects in appliances due to the master's fault." Stager v. Troy Laundry Co., 38 Or. 480, 485, 63 Pac. 645, 646 (53 L. R. A. 459) ; Shearman & Redfield on Negligence (5th Ed.) §§ 185, 209, 209a.

The rule is thus concretely stated in Leary v. Boston & Albany Railroad, 139 Mass. 580, 2 N. E. 115, 52 Am. Rep. 733:

"The servant assumes the dangers of the employment to which he voluntarily and intelligently consents, and, while ordinarily he is to be subjected only to the hazards necessarily incident to his employment, if he knows that proper precautions have been neglected, and still knowingly consents to incur the risk to which he will be exposed thereby, his assent dispenses with the duty of the master to take such precautions."

See, also, Fitzgerald v. Connecticut River Paper Co., 155 Mass. 155, 29 N. E. 464, 31 Am. St. Rep. 537.

The evidence of John Ritchye, a witness for defendant, would tend to show that the plaintiff was foreman in the factory. Such was probably not the case, as Kuettner was superintendent, and the factory was being operated under his supervision. What the witness really meant, probably, is that plaintiff was foreman, or, as otherwise expressed, the chief mechanic, in installing the machinery at the time that the appliances were put in which gave rise to this controversy. At the time this machinery was put in, the construction was under the general supervision of a man by the name of Funk, who was also superintendent of the plant. Plaintiff, as a witness in his own behalf, relates that he was chief engineer of the plant and had charge of the machinery, "everything down below"; that the machinery was installed under the directions of Funk, and that witness carried out his orders in that respect, and was there and familiar with the machinery when it was installed; that he made the sieve, and hoisted it up, and put it in place; that the carpenters prepared the framework to set the shaft in, and that he does not know whether he was there when the shaft was put in place; that he might have been there, off and on, but he was attending to other business, putting in another shaft to run that.

"We didn't consider that anything of importance," he says, "and I was working on this other work, making bolts, and one thing and another—I don't know what I was doing—I was working different places around."

Witness further testified that it was one of his duties, and that he was so directed by the superintendent, to go up and shift the gate

when necessary, and that he continued to watch that until he was injured.

Ritchye testified that he and his carpenter built the framework in which the shaft bearing the sieve was set. Then this inquiry followed:

"Q. Did McMillan go up there and boss you carpenters, too? A. No, sir. Q. Didn't give you any orders about your work, did he? A. He didn't give us any particular orders about the carpenter work. Q. You know McMillan never did give you any orders, did he? A. He told us where he wanted the machinery installed, and of course I built the framework according to that. Q. He told you where the machinery was going to be installed, and you went ahead and built the framework for the machinery? A. Yes, sir."

A. H. Kuettner, who was superintendent at the time the accident happened, but not at the time the machinery was installed, testified that this machinery was set in place by McMillan, Togg, and himself, and that McMillan was present at the time. There was other testimony with respect to the lighting, in which there is a disagreement as to whether the place was well or poorly lighted.

Through a careful consideration of all the testimony in the case it is apparent that there is a controversy in question of fact as to whether the plaintiff was himself negligent respecting the accident that resulted in his injury, or whether he should be held to have assumed the risks attending his employment. As chief engineer about the factory, he directed the construction of the framework and putting it in place. He also constructed the sieve and attached it to the shaft, and the shaft was placed in its bearings also under his direction. But as to whether he was present at the time it was done there is a dispute in the testimony. There is no testimony that he constructed the shaft with the collar attachment, or had anything to do with the arrangement of the set screws, or supervised the work pertaining thereto; and it is only by inference, deducible from the testimony touching his general knowledge of the machinery and its construction, that it may be argued that he had knowledge that the set screws protruded, rather than being imbedded in the shaft, as is often done in careful construction. Whether the menace therefrom was open and obvious to one working about the shaft depends largely upon the question of proper lighting, and as to this, as we have seen, there is a disagreement in the testimony.

[3] In order to warrant a directed verdict, the case on the testimony must be clear and indisputable, and about which there could reasonably be but one opinion. Lincoln v. Power, 151 U. S. 436, 439, 14 Sup. Ct. 387, 38 L. Ed. 224. See, further, as to a directed verdict, Huber v. Miller, 41 Or. 103, 68 Pac. 400, and Stager v. Troy Laundry Co., 41 Or. 141, 68 Pac. 405. From the foregoing, we are led to the conclusion that a directed verdict was properly denied.

There is only the further question here insisted upon respecting the court's instruction touching the measure of damages. The objection is directed to language contained in the instruction, as follows:

"You should allow him all the reasonable and necessary expenses to which he has been put for medical care and treatment."

This was on the ground that there was no testimony adduced during the trial bearing upon the particular subject. After detailing other matters to be considered in fixing the damages, the instruction concludes with the language:

"If you find from the evidence that any of those things exist."

While the language complained against might as well have been omitted by the court, it is clear that its presence did the defendant no harm, and there is therefore no reversible error in the instruction.

Judgment affirmed.